## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| BRUCE D. BARON, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br>   v.<br><br>CANOPY GROWTH CORPORATION, DAVID KLEIN, and JUDY HONG,<br><br>       Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Bruce D. Baron ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Canopy Growth Corporation ("Canopy" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.   This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Canopy securities between May 30, 2024 and February 6, 2025, both dates inclusive (the "Class Period"), seeking to recover

damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.    Canopy, together with its subsidiaries, produces, distributes, and sells cannabis and hemp-based products for recreational and medical purposes.  The Company's products include, *inter alia*, pre-rolled joints (*i.e.*, cannabis cigarettes) and its Storz & Bickel brand vaporizer devices.

3.    In November 2024, Canopy announced that it had launched "award-winning California grown Claybourne brand" pre-rolled joints in Canada through an exclusive licensing agreement with Claybourne Co. ("Claybourne").

4.    As Canopy has consistently acknowledged in its SEC filings, "[t]he cannabis industry is a margin-based business in which gross profits depend on the excess of sales prices over costs."  Accordingly, Canopy's efforts to achieve and maintain healthy margins and costs feature prominently in Defendants' narratives about the Company's path to profitability, which is of particular importance to investors and analysts.  Indeed, at all relevant times, Defendants stressed Canopy's implementation of various cost reduction measures to drive improved gross margins and profitability, including, *inter alia*, measures to reduce pre-rolled joint production costs and overall product distribution costs.  Throughout the Class Period, Defendants also repeatedly touted the positive impact that these measures were purportedly having, and would purportedly continue to have, on the Company's profitability and gross margins in its fiscal year ("FY") 2025.[1]

5.    Throughout the Class Period, Defendants made materially false and misleading statements regarding Canopy's business, operations, and prospects.  Specifically, Defendants

---

[1] Canopy's FY ends on March 31.

made false and/or misleading statements and/or failed to disclose that: (i) Canopy had incurred significant costs producing Claybourne pre-rolled joints in connection with the Claybourne product launch in Canada; (ii) the foregoing costs, in addition to certain indirect costs that Canopy incurred in connection with its Storz & Bickel vaporizer devices, were likely to have a significant negative impact on the Company's gross margins and overall financial results; (iii) accordingly, Defendants had overstated the efficacy of Canopy's cost reduction measures and the health of its gross margins while downplaying issues with the same; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.      On February 7, 2025, during pre-market hours, Canopy issued a press release announcing its financial results for the third quarter ("Q3") of its FY 2025.  Among other items, Canopy reported that its "[g]ross margin decreased by 400 basis points ('bps') to 32% in [Q3 2025] compared to [the same quarter the year prior] primarily due to the incremental costs related to the Claybourne infused pre-roll launch in Canada, and an increase in indirect costs of Storz & Bickel vaporizer devices[.]"  These factors contributed to Canopy reporting a wider-than-anticipated Q3 2025 loss of C$1.11[2] per share compared to the C$0.48 per share loss estimated by analysts.

7.      The same day, Canopy held a conference call with investors and analysts to discuss its Q3 2025 financial results.  During the call, Canopy's Chief Financial Officer ("CFO"), Defendant Judy Hong ("Hong"), revealed that the Company's Claybourne product launch costs were "primarily attributable to [the] higher initial cost to produce Claybourne" products. Defendant Hong also disclosed that the "indirect costs" related to Storz & Bickel vaporizer devices were attributable to, *inter alia*, shipping costs.

---

[2] All references to "C$" herein refer to the Canadian dollar.

8.      On this news, Canopy's common share price fell $0.76 per share, or 27.34%, to close at $2.02 per share on February 7, 2025.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Pursuant to Canopy's most recent quarterly report on Form 10-Q, as of February 6, 2025, there were 147,120,088 of the Company's common shares outstanding.  Canopy's common shares trade in the U.S. on the Nasdaq Global Select Market ("NASDAQ").  Accordingly, there are presumably hundreds, if not thousands, of investors in Canopy securities located in the U.S., some of whom undoubtedly reside in this District.

13.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Canopy securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Canopy is incorporated in Canada with principal executive offices located at 1 Hershey Drive, Smiths Falls, Ontario, Canada.  The Company's common shares trade in an efficient market on the NASDAQ under the ticker symbol "CGC."

16.     Defendant David Klein ("Klein") served as Canopy's Chief Executive Officer at all relevant times until January 6, 2025.

17.     Defendant Hong has served as Canopy's CFO at all relevant times.

18.     Defendants Klein and Hong are collectively referred to herein as the "Individual Defendants."

19.     The Individual Defendants possessed the power and authority to control the contents of Canopy's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Canopy's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Canopy, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

20.    Canopy and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

21.    Canopy, together with its subsidiaries, produces, distributes, and sells cannabis and hemp-based products for recreational and medical purposes.  The Company's products include, *inter alia*, pre-rolled joints and its Storz & Bickel brand vaporizer devices.

22.    As Canopy has consistently acknowledged in its SEC filings, "[t]he cannabis industry is a margin-based business in which gross profits depend on the excess of sales prices over costs."  Accordingly, Canopy's efforts to achieve and maintain healthy margins and costs feature prominently in Defendants' narratives about the Company's path to profitability, which is of particular importance to investors and analysts.  Indeed, at all relevant times, Defendants stressed Canopy's implementation of various cost reduction measures to drive improved gross margins and profitability, including, *inter alia*, measures to reduce pre-rolled joint production costs and overall product distribution costs.  Throughout the Class Period, Defendants also repeatedly touted the positive impact that these measures were purportedly having, and would purportedly continue to have, on the Company's profitability and gross margins in FY 2025.

### Materially False and Misleading Statements Issued During the Class Period

23.    The Class Period begins on May 30, 2024, when Canopy issued a press release during pre-market hours announcing its financial results for its fiscal fourth quarter ("Q4") and FY 2024 (the "Q4/FY 2024 Earnings Release").  The Q4/FY 2024 Earnings Release quoted Defendant Hong as stating, in relevant part, that "[w]e have made remarkable progress and delivered dramatic

reductions in [*inter alia*] expenses . . . over the past year[,]" which "significantly enhanced our financial stability and moved us toward achieving positive Consolidated Adjusted EBTIDA."

24.     Likewise, the Q4/FY 2024 Earnings Release touted that Canopy's "[c]onsolidated Gross Margins increased to 27%, an improvement of 4,600 basis points year-over-year in FY2024," with "Storz & Bickel Gross Margins improv[ing] to 41% in Q4 FY2024 driven primarily by a positive shift in product mix."

25.     The same day, Canopy hosted a conference call with investors and analysts to discuss its financial results for Q4 and FY 2024 (the "Q4/FY 2024 Earnings Call").  During the Q4/FY 2024 Earnings Call, Defendant Klein represented, *inter alia*, that "Canopy now has an attractive gross margin profile across all of our businesses, [and] a lean and agile organization that can support growth without a step change in costs[.]"

26.     During the same call, Defendant Hong stated, *inter alia*, that "a new and flexible pre-roll machine is now up and running and is expected to significantly increase pre-roll production and reduce labor costs."

27.     Also on May 30, 2024, Canopy filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and FY ended March 31, 2024 (the "2024 10-K").  The 2024 10-K touted Canopy's anticipated launch of additional products, including pre-rolled products, without disclosing the likely severity of attendant costs to the Company, stating, in relevant part:

> We have aligned our infrastructure to match market growth projections and we are focused on leveraging our capabilities and scale in order to optimize our operating footprint and achieve profitability and growth. Our strategy in Canada includes:
>
> - Continuing the launch of our portfolio of innovative, consumer-centric, premium-focused adult-use cannabis products, specifically [*inter alia*] . . . pre-rolled flower . . . across Canada.

28.     The 2024 10-K also indicated to investors that Canopy's cost reduction measures had resulted in sustainable improvements to its overall gross margin, stating, in relevant part:

> Our gross margin was $80.9 million in fiscal 2024, or 27% of net revenue, as compared to a gross margin of $(63.5) million and gross margin percentage of (19%) of net revenue in fiscal 2023. The year-over-year increase in the gross margin percentage was primarily attributable to [*inter alia*]:
>
> - Improvement in our Canada cannabis segment, primarily attributable to: (i) the realized benefit of our cost savings program and strategic changes to our business that were initiated in [Q4] of fiscal 2023; (ii) a year-over-year decrease in write-downs of excess inventory; and (iii) opportunistic utilization of lower cost inputs.

29.     Similarly, the 2024 10-K touted the positive impact that the purported cost-effectiveness of Canopy's Storz & Bickel segment was having on its gross margins, stating, in relevant part, that "lower input costs and a positive shift in product and channel mix" had led to a "year-over-year increase in [that segment's] gross margin percentage[.]"

30.     In addition, the 2024 10-K purported to warn of risks that "may" occur in connection with Canopy's production activities, including, *inter alia*, "unanticipated cost overruns in growing or producing products," which "***could*** have a material and adverse effect on [its] business, financial condition, results of operations and growth prospects."  (Emphasis added.) Plainly, this risk warning was a generic, catch-all provision that was not tailored to Defendants' actual known risks regarding production costs, particularly in connection with ongoing or anticipated efforts to launch Claybourne's pre-rolled joint products in Canada.

31.     Appended as exhibits to the 2024 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein the Individual Defendants certified that the 2024 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"  In the same SOX

certifications, the Individual Defendants also certified and that "the financial statements, and other financial information included in th[e 2024 10-K], fairly present in all material respects the financial condition, results of operations and cash flows of the [Company] as of, and for, the periods presented in this report[.]"

32.     On August 9, 2024, Canopy issued a press release announcing its financial results for the first quarter ("Q1") of its FY 2025 (the "Q1 2025 Earnings Release "). The Q1 2025 Earnings Release quoted Defendant Klein as stating, in relevant part, that "[t]he fundamentals of our business continue to strengthen," that "our focus on profitable revenue generation is yielding clear results[,]" and that "our core businesses [are] delivering adjusted EBITDA profitability and primed for growth[.]"

33.     The Q1 2025 Earnings Release  also quoted Defendant Hong as stating, in relevant part, that "[o]ur strategic initiatives have led to notable improvements in Gross Margins and Adjusted EBITDA as well as reduction in SG&A [selling, general, and administrative] expenses[,]" and that "[w]e . . . expect to achieve positive Adjusted EBITDA on a consolidated basis in the second half of the fiscal year."

34.     Likewise, the Q1 2025 Earnings Release touted that Canopy's "[g]ross margin increased by 1,700 basis points ('bps') to 35% in Q1 FY2025 driven by improvement in our Canada cannabis segment, which was primarily due to [*inter alia*] the realized benefit of our cost savings program, [and] a shift in channel mix to higher margin medical sales[.]"

35.     The same day, Canopy hosted a conference call with investors and analysts to discuss its financial results for Q1 2025 (the "Q1 2025 Earnings Call"). During the Q1 2025 Earnings Call, Defendant Klein touted Canopy's "continued work to enhance operational efficiency paired with strong cost management" and "prudent investments to increase both [its]

internal flower and pre-roll joint production capacity." He likewise asserted that "[o]ur investment in Pre-Rolled joint production capacity," among other things, would "help drive stronger top line performance in the coming quarters."

36.    Also during the Q1 2025 Earnings Call, Defendant Klein stated that Canopy's "Canadian cannabis business implemented a new hybrid sales model during [Q1] with a mission to enhance distribution[,]" which purportedly "complement[ed the Company's] in-house sales capabilities in a cost-efficient manner[.]"

37.    On the same call, Defendant Hong touted Canopy's purported "increased throughput in pre-roll production and reduction in labor costs with a new and flexible pre-roll machine now up and running."

38.    Also on August 9, 2024, Canopy filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its fiscal Q1 ended June 30, 2024 (the "Q1 2025 10-Q"). The Q1 2025 10-Q continued to indicate to investors that Canopy's cost reduction measures had resulted in sustainable improvements to its overall gross margin, stating, in relevant part:

> Our gross margin was $23.0 million in [Q1] of fiscal 2025, or 35% of net revenue, as compared to a gross margin of $13.8 million and gross margin percentage of 18% of net revenue in [Q1] of fiscal 2024. The year-over-year increase in the gross margin percentage is primarily attributable to:
>
> - Improvement in our Canada cannabis segment, primarily attributable to: (i) the realized benefit of our cost savings program and strategic changes to our business that were initiated in [Q4] of fiscal 2023; (ii) a year-over-year decrease in write-downs of excess inventory; and (iii) a shift in channel mix to higher margin medical sales; and
>
> - Improvement in our international markets cannabis segment, primarily due to an increase in sales mix to higher-margin Poland as well as a lower overall cost structure.

39. The Q1 2025 10-Q also downplayed issues with the cost-effectiveness of Canopy's Storz & Bickel segment, stating, in relevant part:

> Gross margin for our Storz & Bickel segment was $7.3 million in [Q1] of fiscal 2025, or 40% of net revenue, as compared to $7.7 million in [Q1] of fiscal 2024, or 43% of net revenue. The year-over-year decrease in the gross margin percentage is driven primarily by a shift in product mix as additional rebates were provided to clear out remaining stock of a previously planned discontinued product.

40. In addition, the Q1 2025 10-Q directed investors to the 2024 10-K's discussion of risk factors "that could affect our results of operations, financial condition and liquidity," which included the merely generic, catch-all provision referenced in ¶ 30, *supra*, regarding potential "unanticipated cost overruns in growing or producing products[.]" That provision was not tailored to Defendants' actual known risks regarding production costs, particularly in connection with ongoing or anticipated efforts to launch Claybourne's pre-rolled joint products in Canada.

41. Appended as exhibits to the Q1 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by the Individual Defendants.

42. On November 8, 2024, Canopy issued a press release announcing its financial results for the second quarter ("Q2") of its FY 2025 (the "Q2 2025 Earnings Release"). The Q2 2025 Earnings Release quoted Defendant Hong as stating, in relevant part:

> We've demonstrated another quarter of progress towards profitability driven by improvement in gross margins as well as a reduction in SG&A expenses. With expected improvement in top-line growth in the second half of the fiscal year and continued cost discipline, we believe we remain on a path to achieve positive Adjusted EBITDA at the consolidated level in the coming quarters.

43. Likewise, the Q2 2025 Earnings Release touted that Canopy's "[c]onsolidated gross margin increased by 100 basis points ('bps') to 35% in Q2 FY2025 compared to Q2 FY2024 primarily due to the realized benefit of the Company's cost savings program as well as a shift to higher-margin medical cannabis sales."

44.    The same day, Canopy hosted a conference call with investors and analysts to discuss its financial results for Q2 2025 (the "Q2 2025 Earnings Call").  During the Q2 2025 Earnings Call, Defendant Klein touted Canopy's "improved cost structure," while alluding to the Claybourne product launch in Canada and its anticipated financial benefits for the Company, stating, in relevant part:

> [T]o improve the performance of our adult-use business, we're investing in a robust NPD [new product development] pipeline with a particular focus on the growth categories of pre-rolled joints, vapes and concentrates. One such example coming to market is an innovative brand of infused pre-rolled joints, that's a top seller in California and will be available to consumers in the next month. Early feedback from provincial cannabis sports and retail partners has been overwhelmingly positive. We're confident that this new product lineup in the high-margin pre-roll category will resonate well with consumers and contribute meaningful revenue over the coming quarters.

Notably, Defendant Klein failed to address what, if any, gross margin contraction Canopy was experiencing as a result of costs associated with producing Claybourne products in anticipation of this product launch.

45.    During the same call, Defendant Hong represented, in relevant part, that "strong revenue growth in [*inter alia*] Storz & Bickel . . . [was] driving year-over-year improvement in gross margins," and that "with . . . continued cost discipline, we believe we remain on a path to achieve positive adjusted EBITDA at the consolidated level in the coming quarters[.]"

46.    Also on November 8, 2024, Canopy filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operating results for its fiscal Q2 ended September 30, 2024 (the "Q2 2025 10-Q").  The Q2 2025 10-Q continued to indicate to investors that Canopy's cost reduction measures had resulted in sustainable improvements to its overall gross margin, stating, in relevant part:

> Our gross margin was $21.8 million in the second quarter of fiscal 2025, or 35% of net revenue, as compared to a gross margin of $23.4 million and gross margin

percentage of 34% of net revenue in the second quarter of fiscal 2024. The year-over-year increase in the gross margin percentage is primarily attributable to improvement in our international markets cannabis segment, primarily due to an increase in sales mix to higher-margin Poland as well as a lower overall cost structure.

47.    The Q2 2025 10-Q also continued to downplay issues with the cost-effectiveness of Canopy's Storz & Bickel segment, stating, in relevant part:

Gross margin for our Storz & Bickel segment was $5.1 million in the second quarter of fiscal 2025, or 32% of net revenue, as compared to $3.9 million in the second quarter of fiscal 2024, or 33% of net revenue. The year-over-year gross margin percentage remained consistent period over period as rebates provided to clear out remaining stock of a previously planned discontinued product were offset by strong margins realized on other product sales.

48.    In addition, the Q2 2025 10-Q continued to direct investors to the 2024 10-K's discussion of risk factors "that could affect our results of operations, financial condition and liquidity," which included the merely generic, catch-all provision referenced in ¶ 30, *supra*, regarding potential "unanticipated cost overruns in growing or producing products[.]" That provision was not tailored to Defendants' actual known risks regarding production costs, particularly in connection with ongoing or anticipated efforts to launch Claybourne's pre-rolled joint products in Canada.

49.    Appended as exhibits to the Q2 2025 10-Q were substantively the same SOX certifications as referenced in ¶ 31, *supra*, signed by the Individual Defendants.

50.    On November 20, 2024, Canopy issued a press release announcing "the launch of the award-winning California grown Claybourne brand in Canada." Therein, Canopy touted the "multi-step innovative, artisanal and hand-made approach to crafting the final product" of Claybourne's pre-rolled joint offerings, without disclosing the significant costs associated with this process, much less the negative impact of these costs on the Company's gross margins.

51.     The statements referenced in ¶¶ 23-50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about Canopy's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Canopy had incurred significant costs producing Claybourne pre-rolled joints in connection with the Claybourne product launch in Canada; (ii) the foregoing costs, in addition to certain indirect costs that Canopy incurred in connection with its Storz & Bickel vaporizer devices, were likely to have a significant negative impact on the Company's gross margins and overall financial results; (iii) accordingly, Defendants had overstated the efficacy of Canopy's cost reduction measures and the health of its gross margins while downplaying issues with the same; and (iv) as a result, Defendants' public statements were materially false and misleading at all relevant times.

52.     In addition, throughout the Class Period, Canopy's periodic financial filings were required to disclose the adverse facts and circumstances detailed above under applicable SEC rules and regulations.  Specifically, Item 105 of SEC Regulation S-K, 17 CFR § 229.105 ("Item 105"), required Canopy to "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the [Company] or offering speculative or risky" and "[c]oncisely explain how each risk affects the [Company] or the securities being offered."  Defendants failed to disclose, *inter alia*, that Canopy had incurred significant costs producing Claybourne pre-rolled joints in connection with the Claybourne product launch in Canada.  Defendants also failed to disclose, *inter alia*, that the foregoing costs, in addition to certain indirect costs that Canopy incurred in connection with its Storz & Bickel vaporizer devices, were likely to have a significant negative impact on the Company's gross margins and overall financial results.  Defendants' failure

to disclose the foregoing issues violated Item 105 because these issues represented material factors that made an investment in the Company speculative or risky.

53.    Defendants also violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Canopy to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants' failure to disclose, *inter alia*, the issues described *supra* at ¶ 52 violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

## The Truth Emerges

54.    On February 7, 2025, during pre-market hours, Canopy issued a press release reporting its financial results for Q3 of its FY 2025 (the "Q3 2025 Earnings Release").  Among other items, Canopy reported that its "[g]ross margin decreased by 400 basis points ('bps') to 32% in [Q3 2025] compared to [the same quarter the year prior] primarily due to the incremental costs related to the Claybourne infused pre-roll launch in Canada, and an increase in indirect costs of Storz & Bickel vaporizer devices[.]"  These factors contributed to Canopy reporting a wider-than-anticipated Q3 2025 loss of C$1.11 per share compared to the C$0.48 per share loss estimated by analysts.

55.    The same day, during intraday trading hours, Canopy hosted a conference call with investors and analysts to discuss its financial results for Q3 2025 (the "Q3 2025 Earnings Call").  During the Q3 2025 Earnings Call, Defendant Hong revealed that the Company's Claybourne product launch costs were "primarily attributable to [the] higher initial cost to produce

Claybourne" products.  Defendant Hong also disclosed that the "indirect costs" related to Storz & Bickel vaporizer devices were attributable to, *inter alia*, shipping costs.

56.    Following the Q3 2025 Earnings Release and Q3 2025 Earnings Call, Canopy's common share price fell $0.76 per share, or 27.34%, to close at $2.02 per share on February 7, 2025.

57.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

58.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Canopy securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

60.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Canopy securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Canopy or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

61.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

63.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Canopy;

- whether the Individual Defendants caused Canopy to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Canopy securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

64.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

65.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Canopy securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Canopy securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

66.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

67.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

68.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

70.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Canopy securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Canopy securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

71.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for Canopy securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Canopy's finances and business prospects.

72.     By virtue of their positions at Canopy, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

73.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Canopy, the Individual Defendants had knowledge of the details of Canopy's internal affairs.

74.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Canopy. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Canopy's businesses, operations, future financial condition and future prospects. As a result of the

dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Canopy securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Canopy's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Canopy securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

75.     During the Class Period, Canopy securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Canopy securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Canopy securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Canopy securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

76.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

77.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

78.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

79.    During the Class Period, the Individual Defendants participated in the operation and management of Canopy, and conducted and participated, directly and indirectly, in the conduct of Canopy's business affairs.  Because of their senior positions, they knew the adverse non-public information about Canopy's misstatement of income and expenses and false financial statements.

80.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Canopy's financial condition and results of operations, and to correct promptly any public statements issued by Canopy which had become materially false or misleading.

81.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Canopy disseminated in the marketplace during the Class Period concerning Canopy's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Canopy to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Canopy within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Canopy securities.

82.    Each of the Individual Defendants, therefore, acted as a controlling person of Canopy.  By reason of their senior management positions and/or being directors of Canopy, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Canopy to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Canopy and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

83.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Canopy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: April 4, 2025                                  Respectfully submitted,

                                                      POMERANTZ LLP

                                                      */s/ Jeremy A. Lieberman*
                                                      Jeremy A. Lieberman
                                                      J. Alexander Hood II

James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

Bruce D Baron

1.    I, _____, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.    I have reviewed a Complaint against Canopy Growth Corporation ("Canopy") and authorize the filing of a comparable complaint on my behalf.

3.    I did not purchase or acquire Canopy securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.    I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Canopy securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.    The attached sheet lists all of my transactions in Canopy securities during the Class Period as specified in the Complaint.

6.    During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.    I agree not to accept any payment for serving as a representative party on behalf of the Class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed ___4/1/2025_____
                 **(Date)**

Signed by:

*Bruce D Baron*

1ECC318F6A1D471...
_____
**(Signature)**

Bruce D Baron
_____
**(Type or Print Name)**

**Canopy Growth Corporation (CGC)**                                                  **Bruce Baron**

### List of Purchases/Acquisitions and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase/Acquisition | 6/21/2024 | 7 | $6.9400 |
| Purchase/Acquisition | 8/2/2024 | 7 | $6.6100 |
| Purchase/Acquisition | 8/27/2024 | 4 | $5.7800 |
| Purchase/Acquisition | 9/19/2024 | 2 | $4.7400 |
| Purchase/Acquisition | 10/17/2024 | 1 | $4.2300 |
| Purchase/Acquisition | 11/15/2024 | 1 | $3.7150 |
| Purchase/Acquisition | 12/18/2024 | 1 | $2.8400 |